Hear ye, hear ye. This Honorable Appellate Court for the Second District is now open. The Honorable Justice George Bridges presiding, along with Justice Susan F. Hutchinson and Justice Catherine Ezeanoff. The case is number 2180961, People of the State of Illinois, Plaintiff Appellee v. Richard Gonzales, Defendant Appellant. Arguing for the Appellant, Amanda J. Hamilton. Arguing for the Appellee, John G. Barrett. Good morning. Well, afternoon now. Good afternoon. Are both parties ready to proceed? Yes, Your Honor. Yes, Your Honor. Very well. Ms. Hamilton, you may proceed. Thank you, and good afternoon, Justices and Counsel, and may it please the Court. I do want to take a brief moment just to thank this Court and the Clerk of the Court, as well as your respective teams, for your dedication and hard work to make this remote oral argument possible. While I certainly can't wait to get back to in-person oral argument, I do appreciate the opportunity, and I do appreciate this Court's demonstrated commitment to ensuring that it can continue to administer justice throughout the situations we're facing in 2020. So I do want to say thank you for that. Turning to the merits of this particular case before the Court, we are asking that the trial court's finding of be reversed based on the state's failure to prove all the elements of the crime of home invasion beyond reasonable doubt. Alternatively, we are asking this Court to find that the trial court's decision to impose the full 10-year sentence that was requested by the state, that that was an error and that a reduced sentence is actually more appropriate given the facts presented. As to the reasonable doubt argument, we believe that the state failed to prove beyond reasonable doubt that Mr. Gonzalez actually entered the dwelling place of another and further failed to prove beyond a reasonable doubt that he either caused injury or threatened imminent harm within that dwelling place. And I believe that the record is really instructive as to where the state's deficiencies were. They come from three primary areas. The first is the inconsistent testimony that was offered from the state's chief witness, Mrs. Lydia Edwards. And as we set forth in our brief, there are a lot of she told the 911 operator that Mr. Gonzalez came to their house, not inside their house or came into came to their house. And then she also claims that he punched her husband and that he had a bat at the door. But then on her during her direct testimony, she kind of changed that story and said that she saw Mr. Gonzalez hit her husband with the bat, but then also said that when she first came into the room, her husband was already lying on the ground and was bleeding. She had no there's no mention of any back to the police. And as we demonstrated throughout our brief, there were just a lot of inconsistencies that I think demonstrate reasonable doubt as to whether or not Mr. Gonzalez actually one entered the home or two injured Mr. Mr. Edwards within that home. The second area of reasonable doubt is found in the physical evidence. For example, the room that were submitted at the trial level show that this, um, mudroom area, as it's been referred to, was extremely cluttered, had three different doors that opened at all different angles. Um, there was really very little room to move. And based on those pictures in the evidence, it's very difficult to understand how Mr. Gonzalez, who is a 6 ft 200 and some pounds gentleman, um, would have been able to be in that room wielding a bat over his head as Ms. Edwards claimed. Additionally, the physical evidence that demonstrates reasonable doubt is found in the very, very minor injuries sustained by Roger Edwards. He sustained a very small cut or scrape near his eye and a very small bruise. Um, that type of injury is just not consistent with the type of attack described by the state's witness, Lydia. Um, it is, however, very consistent with the testimony from Mr Gonzalez, who said that they had an altercation while they were standing. Well, Mr Edwards was standing in the threshold on Mr Gonzalez was on the porch area and that then Mr Edwards stumbled, having been drinking all day and fell down with part of his face hitting his door. Additionally, the last part of physical evidence that indicates reasonable doubt is that there was absolutely no DNA found on the bat from Mr Edwards. Um, the state did perform a DNA analysis on the bat in question, and they did find Mr Gonzalez's DNA on his own bat, but they did not find any DNA from, um, the purported victim, Mr Edwards. And lastly, we believe that the state failed to prove any sort of imminent use of threat of imminent use of force. Um, as the court said in people be Goodman, a future threat of injury is not enough. Um, and as the court held that people be done with merely having a bat nearby or even like wielding a bat is simply insufficient to establish imminent danger. Um, in summation, your honors, the court in Witherspoon reiterated that the purpose of the home invasion statute in and of itself is to protect people within their homes. The facts presented in this case indicate that essentially two neighbors who had a disputes over paying rent or doing free painting work on one's car, um, had an altercation at the threshold of Mr Edwards is home. Um, it's established the victim had been drinking all day and sustained a very, very minor injuries. Those facts, combined with the state's chief witnesses, inconsistent testimony, we believe established reasonable doubt as to for a lower sentence. We believe that the field the court failed to take into account. Um, one, the provocation, the evidence concerning the arguments in the history and the, um, significant disputes between Roger and Mr Edwards and Mr Gonzalez and improperly assessed a factor in aggravation, which we believe was an essential element of the crime for which Mr Gonzalez was convicted. Um, and with that, your honors, I know that it looks like I have a little bit of uninterrupted time left, but, um, being a second district girl born and raised, I would like to yield the rest of my time for any questions from the justices so that I can address any specific concerns you all might have. Thank you, Miss Hamilton. Justice Hutchinson, do you have any questions? Yes, I do. Thank you. Um, where was Mr Edwards lying? Excuse me when the police arrived? Is that in the record? It's not your honor. At that point, by the time the police arrived, he he originally didn't want an ambulance to come. So I believe the record indicates that he had been, he was sitting in the kitchen at that point when the paramedics arrived and he wanted to do their assessment. So I believe Mrs Edwards testified, though, that as she walked into the kitchen, she could see the mudroom and he was on the floor in the mudroom and Mr Gonzalez was above him or was was there but standing up in the mudroom. Isn't that what she testified to? That was that was part of her testimony. Yes. But in that same testimony, she did sort of change her story a bit as to her testimony was that when she came into the room, she saw her husband lying on the ground bleeding and that Mr Gonzalez was standing there. And so he was in the house. I believe that's what she testified. That's what she testified to. Okay. So the issue of her inconsistency may go to the issue of where the bat was, how the bat was held. Um, but not necessarily where Mr Gonzalez is at the time she arrived in that kitchen. I would not agree with that, your honor. I believe that the inconsistency is also in that whether or not he actually crossed the thresholds because again, she told the 911 operator that someone came to her home. Um, and that the positioning of, um, Mr Edwards was such that he was, he was right at the door. Um, and if you look at the pictures that were admitted into evidence, you can kind of see that there is, um, like a laundry machine and some coat racks and lots of other cabinets and things such like that in the mudroom itself, such that it wasn't a very, um, large space at all. So I don't think the record is very clear on that. All right. Um, the trial court heard that her heard Mrs Edwards testimony about the 911 call and said that she was upset. Um, he is the arbiter here since this is a bench trial, I believe of the facts and the credibility of the witnesses. And why should we say that he is incorrect? Um, will you correct your honor and that obviously, um, the court or the finder of fact in any trial is the best judge of witness credibility. Um, but I the 911 argument combined with the physical evidence, um, as well as Mr Gonzalez's testimony, just really demonstrate all together taken as a whole that the trial court aired that there is reasonable doubt to be found here, especially for the crime of home invasion. Um, which is very specific as to its purpose and to the way that it should be applied and that it specifically requires the entering into the dwelling place and then the injury occurring within that same dwelling place. All right. Excuse me. Thank you. Um, counsel, I have no other questions. Thank you, Justice Bridges. Thank you, Justice Hutchinson. Just as enough. Do you have any questions? I do. Following up on what Justice Hutchinson asked about. Are you saying counsel that, um, it was unreasonable and improbable and unsatisfactory? Um, for the trial court to have looked at this inconsistent evidence, I'm sorry, inconsistent testimony that Mrs. Edwards gave the 911 testimony that you say, as well as her testimony at the trial. And, um, are you saying that, um, the trial court was unreasonable in finding her credible because of those inconsistencies? That's the position that we're taking, Your Honor, simply because, like I said of all the other physical evidence, the fact that, um, you know, this injury sustained by Roger in this instance are just simply inconsistent, utterly inconsistent with the events described by Ms. Edwards. Additionally, you can hear in the 911 call when when you replay it, there's a lot of coaching happening. She's speaking in the background. When Roger is speaking to the 911 operator, she's sort of adding some additional facts. She's clearly very upset. There's no question about it. But I think that that speaks a bit to her bias and or demonstrates that there's some embellishing going on as to what actually happened. The changing of the story between punched her husband and then using a bat and how many blows were witnessed or things like that. Again, when you look at the photographs of the actual injury, it's just much more consistent with Mr Gonzalez's version of the events where someone who had been admittedly drinking all day long, who appeared intoxicated and impaired to the paramedics, um, you know, while having a very heated verbal altercation, uh, at his threshold, um, stumbled and fell into his door, sustaining the bruising and cut that was witnessed. I think that is very reasonable to make that conclusion. So I don't believe the state proved their case beyond all reasonable doubt. But we you would agree the testimony of the single witness is sufficient to convict. Correct? Not in this case. I would not, Your Honor. No, based on based on the things that I just mentioned. Uh, but again, I think you did agree with Justice Hutchinson's comment embedded in the question that it is the trial court who determines that it's a trial trier of fact in this case that determines the credibility of the witnesses. Correct? Absolutely. Absolutely. Correct. With regard to your, um, sentencing argument and provocation, that, um, is somewhat tenuous. That is the because, is it not? The evidence shows the record shows in this case that the report that, um, uh, one of Mr Edwards employees came to the defendant's place of business was made after the report of the Edwards as to the home invasion. Not before. Isn't that correct? That is correct that there's some inconsistencies in in the testimony and as to when the actual excuse me when the actual reporting happened. Um, so it's not. I'm sorry. Go ahead. Yeah. Well, I would say so. Then how could that be a failure on the court's part to take into account provocation if indeed there really was no strong evidence of provocation? Well, I think there was at least evidence of, um, the argument and the history preceding that argument with Mr Gonzalez and Mr Edwards having this sort of long term disputed history about whether or not Mr Gonzalez should be, um, performing body work and paint painting Mr Edwards's car for free. Um, and, um, this issue of whether or not Mr Gonzalez, because he had left his rental property, um, and was no longer paying rent, um, that Mr Edwards was very upset by that. And there was a lot of swearing back and Um, is what we based our argument or our claim of provocation on. Okay. Um, and your other point with regard to sentencing was that the trial court, um, took into account a factor that should not have been taken into account. A factor in aggravation. Is that correct? That's correct, Judge. We believe that the trial court in this case took into account, um, the it's section a one that the defendant's conduct caused or threatened serious harm. And they took that into account as an aggravating factor, which we argue is a essential element of the crime for home invasion for which Mr Gonzalez was convicted. And we also argue that even if it wasn't, um, you know, the prohibition of this single factor as an element of the crime and in aggravation that the evidence just does not support that there was no there's no conduct that caused or threatened serious harm. Um, when you examine the actual injury sustained by the would be victim in this case, it just doesn't. There's no serious harm shown there. Mr Edwards even wanted to refuse an ambulance. He it's a minor scrape and some bruising, and we just don't believe that that rises to the level of serious harm. The language in that factor is caused or threatened. Is it not? Not that's correct. We Yeah, threatened. Well, wielding a baseball bat, the trial court could have thought that wielding a baseball bat against another person certainly could have threatened serious harm. Um, but, um, the record doesn't indicate exactly, um, what what the court felt about the bat. But I think it's important to realize what the factor in aggravation, what the language is in that factor in aggravation. Um, the state here made clear in the closing arguments at the trial. Did it not that it wasn't seeking any enhancement as far as the sentencing went? But the state really mentioned that specifically. Isn't that correct? I believe that's correct, Judge. And then the trial court was specific in indicating that, um, the court knew that it could take into account the manner in which, um, uh, the crime was committed nature and circumstances of the offense. In fact, I think the parties mentioned Saldivar principles in Saldivar. So the court certainly was aware of the fact that it would have been improper to, um, uh, take, um, that same factor into account twice. One that was implicit in the element of the offense. And then again, as a factor in aggravation. Yeah, I believe that's correct, Judge. I believe that's what the record shows. Okay. All right. I don't have any other questions. Thank you, Council. Thank you. Thank you, Justice. Enough. Council. I have a couple of questions. Your main argument challenging Lydia's inconsistencies is her testimony. Um, regarding her testimony centered around her description of the attack in that mudroom. Is that correct? That's that's the majority of the inconsistencies. Your honor. That's correct. And that's, um, it's it's the number of blows that she claims she witnessed, which that's at the record at 2 93 to 94. Um, the testimony that that her husband was already on the floor, and that's at the record 289. And then, um, the 911 call was another big area of inconsistency, which we provided at 40. The fact that she didn't mention any sort of back to the police. Um, and there's a there's a lot there, but that's the vast majority of it. That's correct, Judge. And Hamilton, the trial court found that the mudroom and they'll be slightly larger than a nine by nine. And we found that there was sufficient enough large enough to support Lydia's virgin version of the events. Did he not? That's what the trial court found. Yes. Also, the defendant could have held that bad in any number of ways when he struck Rogers. Do you agree with that? I do. But that is not what Miss or what Miss Edwards testified to. She specifically testified that he was wielding it with his hands over his head. Um, and that, um, he struck her husband and given the fact that he was six foot, we just don't believe that that's possible. Defense counsel asked several questions of Lydia on cross examination about the bat being over defendant's head. But Lydia never testified, uh, that, uh, she swung that bat above her head. Is that correct? No, that's correct. In fact, she testified that she stopped the strike. So that's where it kind of created more confusion because she said that she witnessed a strike. But then she said that she was there to stop it because she told, um, Mr Gonzalez to leave. So she did testify that she was almost interrupting the strike. I guess is it's very unclear based on her testimony. You argue the minor injuries sustained by the victim in this case are inconsistent with one with what one would expect having been hit with a bat. But the statute in this case, as pointed out by Justice Zinoff, uh, doesn't require any major serious injuries. In fact, doesn't it only require the threatened use of force? Oh, you're correct. Judging that the statute itself requires an injury, um, or be threatened. Imminent harm within that actual dwelling place. And as I pointed out in our brief, um, people be done lack wielding a bat or even like a four by four or something like that. Wielding it in a threatening manner is still insufficient to establish the imminent danger. Um, black slot. In this case, there's there's also that testimony about, um, threats of future harm or or insufficient to establish, um, the imminent harm within the dwelling place required under the statute. And I'm not getting this nexus on the serious provocation, and I believe that was asked of you in in the court. I mean, how does Roger's helper or assistant threat to the defendant for putting Roger and the landlord in a bad position because he moved out establishes this strong provocation? I'm not. I'm not making that connection and to have it to be considered a mitigating factor. Certainly, Judge. And I think that that comes from Mr Gonzalez's testimony when he took the stand and that he felt as though that helper or employee was sent there by Roger. Um, and he felt as though he had been threatened and that he was very angry and upset at being confronted by that person. And the reason he testified he went, um, to go see Roger that day was because he wanted to say, Why did you send someone to come hurt me at my place of business? So and then that's when the argument just escalated. And this statement was discredited by the court. Is that correct? I would not say that the statement itself was discredited by the court. I believe the one he called the police was discredited by the court. Mr Gonzalez testified originally that he had called the police right away when, in fact, right after the individual came into the business, and it was later established that he called the police after he had this altercation with Roger to report the individual coming into the business. So okay. Thank you, Council. I have no further questions. Justice Hutchinson. Do you have any other questions? No, I don't. Thank you. Justice in off. Do you have any other questions? I do not. Thank you very much, Sam. Miss Hamilton. At the end of that police argument, you will be given an opportunity for rebuttal. Thank you very much. At this time, Mr Barrett, you may begin your argument. You are coming off of mute. I'm sorry. Are you able to hear me now? Hello. Can you hear me now? Yes. Okay. I think my mute button was stuck. I hit it, and I started talking, and then it was still muted. I'm sorry about that. All right. Well, may it please the court, Council. Good afternoon, your honors. I would also like to echo Council's sentiments about hosting this via Zoom today and just being flexible with COVID. Under these circumstances, we all really appreciate the court's efforts to do that. So I'd like to just kind of jump right into the first issue. It looks like the focus here is on the entrance, whether or not there was a crossing over of the threshold by the defendant. I think really what this boils down to, and your honors were already addressing it, is the credibility of the witnesses. We have Lydia saying he entered. And contrary to what Council had said about the 911 interview, the state's evidence, the 911 call, which was state's Exhibit 40, she says, and he came in. So yeah, he came to the later, she says, and he came in and said he's going to kill my family. So we're only getting a part of that story. We're not getting the full story from Defense Council on that 911 call. I think her story was consistent in all respects of someone that is under extreme stress and trauma. And you know, whether or not she said punched, whether or not she said kicked, you know, your mind and your synapses are firing off your, your, I mean, can you imagine, you know, walking in and seeing your loved one on the floor guys hitting them? I mean, your choice of words could be anything at that point. I mean, I think if she's tripped up and nervous, I can understand that. I mean, I can put myself there and just, you know, clumsily wording, you know, you know, the narrative. That's something you would expect. So I don't think that's inconsistent testimony. I don't think that strips her credibility. I really don't see any problem at all with Lydia's testimony. We also have injuries, not only on Roger consistent with what he reported to the 911 operator when he spoke with her, but we also have bruising on Lydia's chest. So it's not that just, we don't just have a guy that maybe he fell down. There's some conjecture about how did those injuries occur? We have two people that are injured here. It wasn't just, it wasn't just Roger falling down. You know, we have, we have Lydia with bruising across her chest. The police took pictures of that. And I, I, uh, disagree with, with, uh, defense counsel, uh, saying that there was no statements offered to the police, um, that, that he had a bat. She absolutely, uh, told the police that he had a bat. She is the, um, the line, I think that, that she was disputing was on page, um, two 90 in the record where he didn't, she didn't go so far as to say he pushed back when, when he came at her with the bat, but the pictures they took clearly show that. I mean, a lot of this stuff is, you know, they're, they're taking pictures. They see the injuries, you know, um, a lot of this stuff comes together just by, by virtue of them being there, looking at it and seeing it, you know, and, uh, also she showed up, there was a show up later on at, uh, the defendant's business where the bat was discovered. So he, she shows up, she points the defendant out and they, they recovered the bat there from his vehicle. So, I mean, they, they understand there's a bat involved here, you know? Um, and that was also reported to 911. So the police officers were aware of the bat. There's no question. They were um, so there was an entrance, um, that, that there was plenty of evidence, you know, this, this talk of the mudroom was the dimensions of the mudroom, uh, would have prevented the defendant from coming in. I mean, it's nine feet by nine feet. You know, he, he had, the defendant had plenty of room to enter, um, and strike Roger with the bat, knock him down as testified to. Um, there would have been no, there would be nothing, um, examining, looking at the pictures that would have prevented him from doing that. Um, and then also with the no DNA on the bat again, uh, the defendant is handling the bat, you know, um, there's brief contact made there, there's, there's a couple of, uh, quick, you know, hits or um, tries to wipe the bat off, leaves with the bat. Uh, the, the DNA could have easily been degraded over time. Um, the reason defendant's DNA is on the bat is because he's the one who who's handling the bat. He possessed the bat for, you know, X number of years. Um, so it isn't all that surprising that Roger's DNA wouldn't have ended up on that bat. Um, so, uh, I guess with the, with that first issue, um, those are the things the state would like to bring to the court's attention. Um, turning now to issue two, um, you know, I was looking at the, uh, I was looking at these factors in aggravation. And if you look at the aggravating factors, factor eight, it says the defendant committed the there, there was, uh, harm considered, uh, you know, you know, harm is involved in the offense and then considered again, that that would actually be okay. Even if that would ordinarily be erroneous in this case, Roger 72. So factor eight, the committed the offense, regardless, the offense could include harm, it would not be a double enhancement where the person is 60 years of age or older. And, and here he's 72 years old. He's, he's also a cancer patient. He had terminal cancer at the time. So I think the, the thin egg skull rule would, would come into play here on that. You take the plaintiff as you find him, you know, uh, he is, he's an older guy, he's a Vietnam vet, you know, he's attacked in his home. You know, this is just, it's a, it's a terrible crime, you with the sentencing, um, uh, with, with, with the sentencing, um, issues brought forward, uh, in defendants brief, I don't think the provocation really is a concern because we have a defendant who wasn't credible, you know, the report. Um, that he made like, like your honors pointed out, he called nine one, one after leaving the residence. I mean, he phoned a non-emergency number, um, which the court dismissed. Um, the court talked about that. They, the court did not believe that calling a non-emergency number after you've been supposedly attacked with a knife, that that's just not a credible scenario. So, uh, you know, I don't think provocation was a mitigating factor in this case at all. Um, but, uh, at this time I'd like to just, uh, turn, uh, you know, the rest of my time over to the court. If you have any questions, I I'd be happy to address them. Thank you, Mr. Barrett. Justice Hutchinson. Do you have any questions? Yes, I do. Mr. Barrett, does the phrase came or come to my house in and of itself mean that the defendant didn't come in? Uh, you know, I, I really don't think so because, you know, there's a sequence of events that have to occur for someone to come inside of your house. I mean, you invite someone to your house. Uh, they have to come to your house first and then they enter and hear, you know, the sequence that we hear on the 911 call, he came to the house and he came in, well, miss Hamilton makes a point of saying, look on the 911 call. She just says, came to our house or, uh, come to our house. I probably came. And that is, she calls that an inconsistency. And so what I was asking you is, uh, is that an inconsistency? No. I mean, I just think that's the sequence of events. He came to the house and then he entered. Okay. Now, even if the first time Mr. Edwards saw Mr. Gonzalez at his door, Mr. Gonzalez did not strike him with the bat, but Mr. Good, Mr. Uh, Edward saw the bat and we've already heard Mr. Gonzalez is a pretty big guy because defense is saying would have been hard for him to swing that bat in that room because of his size. Um, if Mr. Edwards backs up trips and hits his head first, before any other striking occurs, does Mr. Gonzalez still have a responsibility for that? Because he threatened him with that bat. Yeah. I mean, you don't see him making any effort to let Lydia know this guy fell. Um, you know, if that was in fact the case that, that Roger was drunk, he fell down. Uh, the defendant did not make Lydia aware of it. He didn't attempt to call nine one, one himself, check on him, see how his injuries were, anything of that nature. And then he left and supposedly we find out he did call nine one, one after leaving their residence. Well, on that nine one, one call, he didn't, he didn't say anything about Roger falling. So even there, he's aware of it. And just, there's no concern, no regard at all for what just happened to him. Well, not only that, sorry. Well, it sounds like Mr. Edwards goes to the, here's his dogs barking, goes to the door, opens the door. And before there is a strike, he says, call nine one, one. So at that point he has, we don't know if he's fallen, but it doesn't sound like he's, you know, he's struggling to say call nine one, one, it sounds like he's startled and maybe feels threatened. Could that be inferred from that, that sequence of events? Yeah. Yeah. I mean, and also you're dealing with, you know, a sequence of events that's within a span of one minute. So, you know, she hears, uh, Lydia hears him shout out call nine one, one. Um, he might've been standing and then been struck and fallen and he might've called out, uh, while he was on the ground. I mean, this is, we're in a matter of seconds here. So, you know, the, this sequence here trying to parse out, well, this is inconsistent with that and maybe it, you know, I don't think these are the kind of inconsistencies at least in Lydia's testimony or Roger and what, what he was stating to the, on the nine one, one operator anyway, you know, uh, if there are any inconsistencies, uh, between his statements and what she, uh, uh, later stated, you know, they're not real inconsistencies, you know, they're both frantic, they're both, you know, under extreme stress. So I feel like, you know, uh, you know, um, the fact that he said nine one, one while he was standing or while he was on the floor, you know, you're, you're talking to a span of seconds here. You know, um, yeah, this isn't the kind of sequence that's concerning. So, okay. Thank you, Mr. Barrett. I have no other questions. So justice Bridges. Thank you, Justin Hutchinson. Just this, uh, then after you have any questions I do, uh, regarding, uh, sentencing, even if provocation were present here and, uh, were, um, uh, mitigating circumstance or factor, does the existence of mitigating factors obligate a trial court to impose a lesser sentence? Uh, no, it doesn't. I, and you know, the trial court here was aware. Um, you know, in considering, um, all of these factors that there was a history here of violence. You know, this defendant was also guilty of a felony, violent offense, a prior violent aggravated battery against his ex-girlfriend or ex-wife. So he had, he had a prior record then. Did he not? He did. He did. So the need for deterrence, the need for punishment here was definitely, uh, you know, more exaggerated in his case than if this was a first offense. So, you know, I'm sorry. He was eligible for six to 30 years. He received, uh, of 10 years. So is it the job of the appellate court to reweigh the factors in mitigation and aggravation? No, no, it would not be. And, you know, even in a case and then we're in this, you know, uh, the people are not saying that that's true in this case at all, but where a factor, an things the court would look at is whether the sentence received was substantially less than the maximum sentence permitted by the statute. And that's, that's people who work. So here, the, the, the, when you look at the max sentence of 30 years, he received 10, minimum six, he's four years shy of the minimum here. So that would really, really argue against, uh, reversing or remanding for sentencing, um, in this case. But this, like I said, the state is not, um, state's not, uh, conceding that there was an improper factor considered, but had, had there been a, an improper factor considered here, you have a sentence that's close to the bare minimum, so, you know, it still wouldn't be a cause necessarily for that. Right. Um, okay. I don't have any other questions. Thank you. Thank you. Just, uh, I have a couple of questions. Ms. Barrett, as you know, the state can't argue a single factor is both an element of the crime and as an aggravating factor, uh, my question is, did the trial court do that here? When it consented considered that defendants conduct caused or threatened serious harm in the offense requires the defendant to have caused any harm under count to Well, under count to, which is what he was sentenced under, um, if you look at the language in the statute, it says used force. So the use of force does not require harm, any use of force whatsoever. So the fact that, uh, harm was threatened or in this case actually caused, you know, it would not be a double enhancement. But didn't a trial court do that? Court emphasized that defendants conduct caused or threatened serious harm. It did. Yeah. And in, in, in citing to the ag factor and aggravation here, this, the home invasion statute doesn't require that under subsection a one, which he was sentenced under used force. Use of force, um, is all that's required. So enters the residents and then there's use of force in the residence, but there's, there's no requirement of, of harm under age one. Okay. Very well. I have no further questions. Uh, justice Hutchinson, do you have any additional questions? Uh, no, thank you. Justice Bridges. Justice Zinoff. Do you have any additional questions? No, I don't. Very well. Ms. Hamilton, uh, do you, uh, wish to present any rebuttal evidence or argument? Rather. Very briefly, your honors. Um, just in response to some of the arguments made by counsel, um, with respect to the argument about bruising on Lydia, um, the pictures really don't depict that, and that wasn't really a major point that the underlying court, um, was, was persuaded by. And additionally, I, I do want to correct one thing. Um, I don't believe that I misstated the record. What I said was that the written statement to police from Lydia, uh, the testimony, which she offered, which differed from the 911 call with respect to whether or not she mentioned the bat, um, getting to the issue of the bat in and of itself. And I know counsel argued that she was consistent about, um, where it was located or how, what it looked like. Um, again, I don't think it's a major issue, but she was not consistent in that she described it as a different color and being made of wood as opposed to being made of aluminum. Um, the fact that there's no DNA on the bat, I do believe is compelling and there's absolutely no evidence in the record that a defendant somehow wiped it off, I think to argue otherwise would be pure speculation. Um, likewise, there's nothing in the record on appeal that, uh, Roger Edwards was a cancer survivor at that time or suffering from cancer at that time. The evidence in the record is that by the time this matter went to trial, he had died of cancer. Um, and there's certainly no evidence that Mr. Gonzalez knew that he was, that he had cancer. I don't know when he had it, but that's also an improper argument because it's just not in the record. And I don't think it's appropriate for the issues before this court. Again, I just reiterate that the purpose of the home invasion statute is to protect people within their home. Um, what we have here, the facts and evidence are demonstrating that two neighbors, one of which was highly intoxicated, the other, which was very, very angry, gotten to an argument at the threshold. Um, Mr. Gonzalez testified that he was standing on the doormat and never left the doormat. Um, the other evidence is that Roger Edwards was standing inside his mudroom and we're not sure exactly where, where exactly he fell, um, or how he fell because the testimony is simply inconsistent. And I think that the facts of this case are not those that are designed to be invasion statute. And I believe that the state failed to prove all of the elements of home invasion beyond a reasonable doubt. And for those reasons, we'd request reversal. Thank you. Thank you, Mr. Justice Hutchinson. Do you have any questions? Yes. Thank you. Samuelson.  Barrett, even if the defendant, Mr. Edwards at first causing him to fall down, if Mr. Edwards hears his dog sparking, he goes to the door and he opens the door to a large person with a bat in his hand. If this Mr. Edwards then backs up and falls and hits his head, is Mr. Gonzalez still responsible for a home invasion? I'd say no. Um, and the reason is, is that in people be done lap, they have specifically said that wielding a bat is insufficient to establish imminent danger. And I don't believe that you could show any harm or any imminent use of force or imminent threat of danger. So no, I think that that would be inconsistent with the aims of the that sort of situation presented itself. If, if you, um, could find yourself convicted of a class X felony for appearing at someone's door. Um, and if that person falls inside by themselves. So I w I would say no, your honor. Right now, if Mr. Gonzalez comes in, if there is a trip and this is hypothetical, there is a trip and fall down by Mr. Edwards. And that's when Mrs. Edwards walks into the kitchen and sees the mud room and sees Mr. Gonzalez with the bat and says, she, he hit Mr. Edwards with the bat or wielded the bat at Mr. Edwards and hit him. Is that home invasion? Um, I think it would, again, depend on whether or not Mr. Gonzalez had entered, had crossed the threshold into the home. Um, and I also think it would depend on the manner in which the bat was being wielded, because again, it has to be this, this, um, imminent danger. And I don't, I guess it would depend on the specific positioning of the individuals, what the testimony was, what the expressions were, what statements were made. Um, I'm not trying to, uh, not answer your question, your honor. I'm just trying to, I think that there, there's a lot of nuances that, that go into this type of analysis. And I think those nuances are important because I think they, again, speak to the, the nature of the statute and, and how, how this court can frame it so that it best serves the actual purposes of the statute. All right. Even, and let me just ask one sentencing question. Even if there is a, the use of the injury issue, both in the trial for a finding of guilty and then possibly in the sentence, it is quite clear that there is a provision in sentencing, an aggravating provision in sentencing concerning the age and or disability of the victim. Isn't that correct? Yes, that is absolutely correct. Your honor. And so the issue that we would be concerned was, is what if any impact was even mentioning the fact that there was an injury that we heard about in trial? Now, what impact did that have on this sentencing? If in fact, there was a really bright line that Mr. Edwards was considerably over the 60 year old, um, 60 year old, you know, isn't that true? No, that's, that's absolutely true. Your honor, that the trial court has that discretion, um, and just has to consider all the factors and then, um, can is certainly within his discretion as to how to weigh each factor. Thank you very much. Counsel and, uh, justice. I have no other questions. Thank you, Justice Hutchinson. Justice Zenoff, do you have any questions? I do, um, counsel by emphasizing the inconsistencies in Lydia's are you suggesting that, uh, these inconsistencies, uh, point to the fact that she was lying and, uh, therefore the trial court shouldn't have found her credible, um, not necessarily that she was lying your honor, but I do believe that it does speak to her credibility. Absolutely. Um, I think that it shows that she, I'm sorry, what do you mean? Uh, yeah, I don't, I don't know that she, I mean, I, I can't speak to whether or not she was making an intentional misrepresentation at trial or anything like that. Um, but I do think it, it tends to show that her memory of the events and, or her testimony was not, um, sufficiently credible and that either she was misstating or misremembering certain facts or certain key factors, which, as I mentioned earlier, the, the, those little details and some of those nuances are really, really critically important to determine whether or not something like battery or aggravated battery suddenly becomes home invasion. Um, and because those nuances are so critical, the inconsistencies in her testimony, I think are really what, um, way in favor of a finding that the state failed to prove home invasion beyond reasonable doubt. Right. And in judging the trial level and judging credibility of a witness, uh, isn't it common to expect that there might be some inconsistencies as you were referring to, um, the heat of the moment and the, uh, trauma of what occurred, um, might not make everything, uh, completely consistent. Isn't that correct? Oh, I would absolutely agree with that, your honor. But I would, um, but, but my point is, um, if it were the opposite and everything meshed in that kind of situation, that would really deter from someone's credibility. Would it not? Um, um, if, uh, there weren't any inconsistencies at all, um, it would indicate that perhaps someone might be making up a story or changing the details to, uh, suit their own, um, motive. Um, I don't, I don't think so in this case judge, because I think the way, the manner in which the story progressed was, um, going from the 911 phone call to then the police report to them, the testimony at trial, um, everything grew, um, as it progressed. So I think in this case, no, I would, I would disagree with that. Um, but normally I guess if you had a witness who is entirely consistent, um, I think, well, number one, I think they'd be an excellent witness and I'd love to have them in all my cases. Um, but, uh, do I believe that that would make them less credible? Not necessarily, but I think it would depend on the differences or words used to describe the events. Okay. Thank you very much. Counsel. I have no further questions. Thank you. Thank you. Uh, justice and off. Uh, thank you, miss Hamilton. I have no further questions. Thank you. Your honor is very, very much for all of your time. The court. Thanks for both parties for your arguments this afternoon. The case will be taken under advisement and a disposition will be rendered in due course. Mr. Clerk, you may close the case and terminate the proceeding. Thank you. Thank you. Your honors.